THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SWINKA REALTY                    :
INVESTMENTS, LLC,                :
                                 :
        Plaintiff,               :
    v.                           :        3:13-CV-00764
                                 :        (JUDGE MARIANI)
LACKAWANNA COUNTY                :
TAX CLAIM BUREAU and             :
LACKAWANNA COUNTY,               :
                                 :
        Defendants.              :

FILED
SCRANTON

JUL 0 1 2016

PER _____ DEPUTY CLERK

## MEMORANDUM OPINION

Presently before the Court are the parties' cross-motions for summary judgment.

For the reasons set forth below, the Court will grant Defendants' motion in its entirety.

## I.      INTRODUCTION AND PROCEDURAL HISTORY

On February 25, 2013, Plaintiff Swinka Realty Investments, LLC ("Swinka") filed a

Complaint against the Defendants Lackawanna County Tax Claim Bureau (the "Tax Claim

Bureau") and Lackawanna County (the "County") in the Lackawanna County Court of

Common Pleas.  Plaintiff, a bidder at an Upset Tax Sale, alleges that the actions of the Tax

Claim Bureau in setting aside the sale constituted a breach of contract, violated various

provisions of the Fourteenth Amendment, and entitled it to relief under Pennsylvania's

eminent domain code.  (Doc. 1).  Plaintiff also sought mandamus relief in the form of an

order directing the Tax Claim Bureau to deliver it a deed for the property Plaintiff alleges it is

entitled to as a result of the Upset Tax Sale.

Defendants removed the action to this Court and subsequently moved to partially dismiss the Complaint. (Doc. 3). On October 15, 2013, the Court granted Defendants' motion to dismiss and granted Swinka leave to amend. Swinka then timely filed an Amended Complaint on December 2, 2013. (Doc. 23).[1] Thereafter, Defendants moved to partially dismiss the Amended Complaint. (Doc. 25). The Court referred the matter to the Honorable Magistrate Judge Carlson who issued a report and recommendation, recommending that this Court grant in part and deny in part Defendants' motion. (Doc. 31). Specifically, Magistrate Judge Carlson found that Plaintiff's substantive due process claim, (Count III), and its claim requesting the appointment of a Board of Viewers under Section 504 of the Pennsylvania Eminent Domain Code should be dismissed with prejudice (Count IV). (*Id.* at 9-15). The Court adopted Magistrate Judge Carlson's report and recommendation in its entirety. (Doc. 32).

On March 9, 2015, Defendants moved for summary judgment, (Doc. 38), and on April 8, 2015, Plaintiff cross-moved for summary judgment. (Doc. 41). The matter has been fully briefed and ripe for disposition.

---

[1] In the Amended Complaint, Swinka: (1) asserts a claim for breach of contract (*Id.*, Count I ¶¶ 82-93); (2) seeks mandamus relief in order to compel the Defendants' compliance with their duty to transfer the property (*Id.*, Count II ¶¶ 94-100); and (3) alleges a violation of its rights to procedural and substantive due process as well as equal protection in violation of the Fourteenth Amendment. (*Id.*, Count III ¶¶ 101-124). Plaintiff further alleged a violation of Pennsylvania's eminent domain code, (*Id.*, Count IV ¶¶ 125-142), and for the first time alleged that Defendants' course of conduct deprived it of property without just compensation in violation of the Fifth Amendment to the United States Constitution. (*Id.* ¶ 140).

## II.  STATEMENT OF FACTS

### A.  The Parties

Swinka is a Pennsylvania Limited Liability Company formed on or about May 2008 and is solely owned by its President Kimberley Poplawski.  (Doc. 38-1, at ¶¶ 1-2); (Doc. 41, at 4); (Doc. 45-1, at 7).  Plaintiff has no employees and is in the business of buying, selling, and leasing investment properties.  (Doc. 38-1, at ¶¶ 3-4); (Doc. 39-1, at 5).  Mark Gawron, Ms. Poplawski's boyfriend for the past fifteen years, solely operates and manages Plaintiff Swinka.  (Doc. 38-1, at ¶ 5); (Doc. 45-1, at 6).  Ms. Poplawski neither manages nor controls Swinka and is not involved in Swinka's day-to-day operations, testifying that her role as sole owner and President of Swinka is to "just sit back and let Mark do all the work."  (Doc. 38-1, at ¶ 6); (Doc. 39-1, at 5).  At all relevant times, Mark Gawron acted as the authorized agent of Plaintiff Swinka.  (Doc. 39-1, at ¶ 7).

Defendant Lackawanna County Tax Claim Bureau is an agency located within the County of Lackawanna charged with collecting delinquent real estate taxes, as well as holding and conducting Upset, Private, and Judicial Tax Claim Sales.  (Doc. 23, at ¶ 5).  Defendant Lackawanna County is a Third Class County clothed with Eminent Domain powers with its principal place of business in Scranton, Pennsylvania.  (Doc. 38-1, at ¶ 128); (Doc. 33, at ¶ 128).  Tax Claim Bureau Deputy Director Ronald Koldjeski ("Koldjeski") runs the Bureau and is an agent of Defendant Lackawanna County, which has delegated its tax

collection responsibilities to the Tax Claim Bureau.  (Doc. 38-1, at ¶ 8); (Doc. 23, at ¶ 126); (Doc. 33, at ¶ 126).

## B.   Pennsylvania Real Estate Tax Sale Law

Before describing the relevant factual background, it is necessary to cover the statutory scheme at issue in this action.   Under Pennsylvania law, "[a]n upset tax sale may be conducted when a property owner is delinquent in paying taxes." *777 L.L.P. v. Luzerne Cnty. Tax Claim Bureau*, 111 A.3d 292, 296 (Pa. Cmwlth. 2015) (citing 72 P.S. § 5860.601). The Pennsylvania Real Estate Tax Sale Law, 72 P.S. §§ 5860.101 *et seq.*, provides that "after a claim has been made for unpaid taxes, and the property owner has failed to contest the claim, the Bureau may sell the property at a tax sale, after giving the notice required by the act." *Carignan v. Tax Claim Bureau of Cumberland Cnty.*, Civil No. 1:CV-10-1792, 2010 WL 5135893, at *1 (M.D. Pa. Dec. 10, 2010).  Courts in Pennsylvania have repeatedly recognized that "[t]he purpose of the Real Estate Tax Sale Law is to ensure the collection of taxes, not to deprive citizens of their property or to create investment opportunities for those who attend tax sales." *In re Consolidated Return of Tax Claim Bureau of Cnty. of Beaver From August 16, 2011 Upset Sale For Delinquent Taxes*, 105 A.3d 76, 81 (Pa. Cmwlth. 2014); *accord Cruder v. Westmoreland Cnty. Tax Claim Bureau*, 861 A.2d 411, 415 (Pa. Cmwlth. 2004) (citing *Stanford-Gale v. Tax Claim Bureau of Susquehanna Cnty.*, 816 A.2d 1214, 1216 (Pa. Cmwlth. 2003).

Because the primary purpose of the statute is to collect taxes, and not to deprive an owner of his property, the relevant statutory scheme sets forth various mechanisms whereby a delinquent taxpayer may remove his or her property from an Upset Tax Sale.  In particular, Section 603 of the Real Estate Tax Sale Law, which applies to the redemption of property "prior to and during an upset sale," *In re Tax Sale Pursuant to Real Estate Tax Sale Law of 1947*, 8 A.3d 358, 365 (Pa. Cmwlth. 2010), provides:

> Any owner or lien creditor of the owner may, *at the option of the bureau, prior to the actual sale,* (1) cause the property to be removed from the sale by payment in full of taxes which have become absolute and of all charges and interest due on these taxes to the time of payment, or (2) enter into an agreement, in writing, with the bureau to stay the sale of the property upon the payment of twenty-five per centum (25%) of the amount due on all tax claims and tax judgments filed or entered against such property and the interest and costs on the taxes returned to date, as provided by this act, and agreeing therein to pay the balance of said claims and judgments and the interest and costs thereon in not more than three (3) instalments all within one (1) year of the date of said agreement, the agreement to specify the dates on or before which each instalment shall be paid, and the amount of each instalment. So long as said agreement is being fully complied with by the taxpayer, the sale of the property covered by the agreement shall be stayed. But in case of default in such agreement by the owner or lien creditor, the bureau, after written notice of such default given by United States mail, postage prepaid, to the owner or lien creditor at the address stated in the agreement, shall apply all payments made against the oldest delinquent taxes and costs, then against the more recent. If sufficient payment has been made to discharge all the taxes and claims which would have caused the property to be put up for sale, the property may not be sold. If sufficient payment has not been received to discharge these taxes and claims, the bureau shall proceed with the sale of such property in the manner herein provided either at the next scheduled upset sale or at a special upset sale, either of which is to be held at least ninety (90) days after such default. If a party to an instalment agreement defaults on the agreement, the bureau shall not enter into a new instalment agreement with that person within three (3) years of the default.

72 P.S. § 5860.603 (emphasis added).[2]

"A taxpayer who follows the Section 603 procedure, including an installment plan, may remove a property from sale; *however, this does not mean that the taxing authorities cannot agree to another payment plan.*" *In re Public Sale of Properties*, 841 A.2d 619, 624 (Pa. Cmwlth. 2004) (citing 72 P.S. § 5860.208) (emphasis added). That is so because "[s]ection 208 of the Real Estate Tax Sale Law gives a tax claim bureau broad authority for 'the management and disposition of property in accordance with the provisions of this act' in meeting its obligations to collect taxes." *Id.* at 622 (Pa. Cmwlth. 2004) (quoting 72 P.S. § 5860.208). This includes the ability to remove a property from a tax sale when to do so will "advance the collection of delinquent taxes." *Id.*

Following an Upset Tax Sale, the Tax Claim Bureau "must make a 'consolidated return to the court of common pleas.'" *Carignan*, 2010 WL 5135893, at *1 (quoting 72 P.S. § 5860.607(a)). The consolidated return, among other things, "reports on the successful sales of any property." *Id.* "If the sales were made in accordance with the act, the consolidated return and the sales so made shall be confirmed nisi by the common pleas court." *Id.* (citations omitted). Any person wishing to contest the sale "has thirty days after the confirmation to file exceptions with the court." *Id.* Specifically: the statute provides that:

> Any objections or exceptions to such a sale may question the regularity or legality of the proceedings of the bureau in respect to such sale, but may not raise the legality

---

[2] "[A]n 'actual sale' of a subject property does not occur until the successful bidder pays the full amount of money agreed to be paid as the sale price under Sections 605-609." *Weber v. Clearfield Cnty. Tax Claim Bureau*, No. 635 C.D. 2015, 2016 WL 100232, at *4 (Pa. Cmwlth. Jan. 7, 2016).

of the taxes on which the sale was held, or the return by the tax collector to the bureau or of the claim entered. In case any objections or exceptions are filed they shall be disposed of according to the practice of the court. If the same are overruled or set aside, a decree of absolute confirmation shall be entered by the court.

72 P.S. § 5860.607(d). "If no such objections or exceptions are timely filed, a decree of absolute confirmation shall be entered as of course by the prothonotary." *In re Walker*, Bankruptcy No. 03-33446F, 2005 WL 6522758, at *3 (Bankr. E.D. Pa. May 31, 2005) (citing 72 P.S. § 5860.607(c)). "After this sale confirmation occurs, the tax sale purchaser receives a deed from the Tax Claim Bureau." *In re Walker*, 2005 WL 6522758, at *3.

The statute also limits judicial inquiry into the propriety of an Upset Tax Sale, providing:

> If no objections or exceptions are filed or if objections or exceptions are finally overruled and the sale confirmed absolutely, the validity of the tax, its return for nonpayment, the entry of the claim, or the making of such claim absolute and the proceedings of the bureau with respect to such sale, *shall not thereafter be inquired into judicially in equity or by civil proceedings* by the person in whose name such property was sold, by a grantee or assignee, by any lien creditor *or by any other person*, except with respect to the giving of notice under the act, to the time of holding the sale, or to the time of petitioning the court for an order of sale.

72 P.S. § 5860.607(g) (emphasis added).

### C.    The Upset Tax Sale Dispute

With the above statutory background in mind, the Court will address the relevant factual background of the litigation. On September 20, 2010, Defendant Lackawanna County Tax Claim Bureau held an Upset Tax Sale, at which Plaintiff Swinka was a registered bidder. (Doc. 41, at 4). One of the advertised properties listed for sale was a

7

property located at 905 Woodmere Avenue, Dickson City, Pennsylvania (the "Woodmere

Avenue property").  (Doc. 38-1, at ¶ 10).  Prior to the tax sale, John J. Fennell (the owner of

the Woodmere Avenue property) entered into an agreement for the sale of that property.

(Doc. 38-1, at ¶ 11); (Doc. 38-2, at ¶ 6).  Although the parties' dispute whether Mr. Fennell

was the sole owner and occupant of the property at issue, it undisputed that Mr. Fennell

was the owner of the Woodmere Avenue property as of September 20, 2010.[3]  (Doc. 38-2,

at ¶ 10); (Doc. 40, at ¶ 10).

### i.  The Redemption of the Woodmere Avenue Property

Late in the day on September 17, 2010, Armand E. Olivetti, an attorney representing Mr.

Fennell, became aware that the Woodmere Avenue property was listed for sale at the

September 20, 2010 Upset Tax Sale.  (Doc. 38-1, at ¶ 12); (Doc. 38-2, at ¶ 5).  On the date

of the sale, Attorney Olivetti spoke with Mr. Ronald Koldjeski, Director of the Tax Claim

Bureau, regarding removing the Woodmere Avenue property from the Upset Tax Sale so

that Mr. Fennell could proceed with the sale of his property, which was expected to close on

---

[3] Solely for purposes of advancing its argument that Fennell was not entitled to personal service, Plaintiff disputes that Mr. Fennell was the "sole owner and occupant" of the property, noting that "the Declaration of Armand E. Olivetti, Jr., Esquire states clearly that John J. Fennell was not staying at the residential property but recuperating at his daughter's home." (Doc. 40, at ¶ 10).  Plaintiff claims that "[t]his averment by Olivetti creates a genuine issue of material fact as to the issue of 'owner/occupant' for the Defendants' argument that service was not effected, and, further, raises the issue, once again, as to whether the Tax Claim Bureau exhausted its search, enough to overcome the personal service obligation, should one exist in the first place." (*Id.*).  Yet, Plaintiff also notes that "the issue of whether service was good is not before this Court." (*Id.*).  Whether Fennell received proper notice of the tax sale is not before the Court; nor is a determination of this issue necessary to resolve this case.

October 8, 2010.[4]  (Doc. 38-1, at ¶ 13).  At that time, Mr. Olivetti informed Mr. Koldjeski that

Mr. Fennell had been suffering from cancer and was recuperating at his daughter's home,

and, as a result, did not receive personal notice of the tax sale as required by the

Pennsylvania Real Estate Tax Sale Lax.  (Id. at ¶ 14).  Attorney Olivetti offered to arrange

transportation for Mr. Fennell to the Tax Claim Bureau Office, if necessary, prior to the close

of business in order to "remove the property from the sale by signing an Owner/Occupant

residential installment payment agreement and making a 25% down payment towards the

delinquent taxes."  (Id. at ¶ 15).

   Mr. Koldjeski then informed Attorney Olivetti that the property would be removed from

sale if his office received a letter before 2:00 p.m. that day:  (1) confirming the closing

together with satisfactory documentation establishing the contract for sale; (2) confirming

that the sale would take place shortly after the tax sale; and (3) stipulating to pay the

delinquent taxes out of the sale proceeds.  (Id. at ¶ 17).  Mr. Koldjeski further indicated that

he would accept a commitment letter in place of the standard installment payment

agreement so that Mr. Fennell would not have to travel to Scranton that day.  (Id. at ¶ 18).

Thereafter, Attorney Olivetti faxed certain documentation to the Tax Claim Bureau around

---

[4] Mr. Koldjeski testified (three years after the fact) that he could not recall the conversation with Attorney Olivetti, but that he recalled receiving what he determined to be satisfactory documentation regarding the redemption of the Woodmere Avenue property on September 20, 2010.  (Doc. 39-4).

noon on September 20, 2010 and was subsequently informed that the property had been

removed by sale.[5]   (Doc. 40, at ¶¶ 18-19).

### ii.  Plaintiff Swinka is the Sole Bidder for the Woodmere Avenue Property at the Upset Tax Sale

The September 20, 2010, Upset Tax Sale commenced at 10:00 a.m. and Plaintiff

Swinka, through its agent Mark Gawron, was the sole bidder for the Woodmere Avenue

property.[6]   (Doc. 38-1, at ¶ 28); (Doc. 41, at 5).  Prior to the start of the Upset Tax Sale, Mr.

Koldjeski informed all potential bidders that delinquent property owners can redeem the

property sold at the Upset Tax Sale until the close of business on the day of the sale.  (Doc.

38-1, at ¶ 33).  However, neither the Tax Claim Bureau's advertisements nor the verbal

instructions to the bidders read by Mr. Koldjeski indicated that a property owner has any

right to redeem a property by means of commitment letter.  (Doc. 41, at 6); (Doc. 39-4, at 8).

---

[5] Plaintiff disputes many of the facts in the preceding paragraphs, directing the Court to what it claims are inconsistencies between the Olivetti Declaration and the testimony of Mr. Koldjeski and Ms. Cathy Chelland.  Specifically, Plaintiff maintains that there are disputes of material fact with respect to:  (1) "whether Mr. Fennell had actual notice prior to the Upset Sale," (Doc. 40, at ¶ 12); and (2) "whether (a) there was, indeed, a conversation between Armand Olivetti and Ronald Koldjeski; (b) there was any agreement to remove 905 Woodmere Avenue from the tax sale based on any letter; (c) there was a conversation between Armand Olivetti and Robin Mezzanti; and (d) there was any misrepresentation by Robin Mezzanti to Armand Olivetti that 905 Woodmere Avenue would or could potentially be removed."  (*Id.* at ¶¶ 13-16).  In addition, Plaintiff alleges that "[t]here is a clear factual issue that must be developed regarding who had what notice and when, together with whether, based on Armand Olivetti's admission, there is a legal requirement to have personal service."  (*Id.* at ¶ 14).  As the Court will discuss more fully below, none of these manufactured, spurious, factual disputes are material to the claims at issue in this litigation.

[6] Mr. Gawron testified that, prior to the Upset Tax Sale, he visited the Woodmere Avenue property and noticed a "for sale" sign in the front yard.  (Doc. 45-1, at 11, 15).

Nor does Section 603 of the Pennsylvania Real Estate Tax Sale Law explicitly provide for redemption by means of commitment letter.

In the afternoon of September 20, 2010, following the conclusion of the Upset Tax Sale, Swinka delivered to the Tax Claim Bureau a money order for $541.16, representing the Upset Sale Price for the Woodmere Avenue property. (Doc. 23, at ¶ 21). Attorney Olivetti, who by this time had faxed certain documentation including the commitment letter to the Tax Claim Bureau, was unaware that any bidding on the Woodmere Avenue property had taken place during the Upset Tax Sale. (Doc. 38-2, at ¶ 12).

### iii.  After the Upset Tax Sale

On September 20, 2010, following the conclusion of the Upset Tax Sale, Mr. Koldjeski personally received the documentation faxed to the Tax Claim Bureau by Attorney Olivetti. (Doc. 38-1, at ¶ 29). In particular, Cathy Chelland (an administrative assistant at the Tax Claim Bureau who reported to Mr. Koldjeski) brought the commitment letter and supporting documentation that Attorney Olivetti faxed to the Tax Claim Bureau to Mr. Koldjeski prior to the close of business on September 20, 2010. (Doc. 38-1, at ¶ 35); (Doc. 39-5, at 6). Because Mr. Koldjeski was satisfied with the documentation he received from Attorney Olivetti, which included what he considered appropriate arrangements to redeem the property and pay the delinquent taxes out of the sales proceeds of the Woodmere Avenue property, Mr. Koldjeski removed the property from the sale as redeemed. The removal of the property from sale occurred *after* Swinka had been the sole bidder earlier that day. (*Id*).

It is undisputed that the money order Swinka delivered to the Tax Claim Bureau was the only payment actually proffered on September 20, 2010, and that Mr. Fennell did not make any actual payment on the date of the Upset Tax Sale. (Doc. 23, at ¶ 29); (Doc. 33, at ¶¶ 29, 51).

The day after the Upset Tax Sale, Ms. Chelland called Mark Gawron and informed him that the Woodmere Avenue property had been removed from the sale because it had been redeemed by the owner. (Doc. 38-1, at ¶ 37); (Doc. 39-5, at 6-9). She further instructed him to pick up his money order at the Tax Claim Bureau's office. (*Id.*, at ¶ 38). Mr. Gawron's testimony confirms Ms. Chelland's account. Specifically, he testified that "[s]he told me to come down and pick up two checks for properties we bought because we're not going to get them because the taxes were paid." (Doc. 45-1, at 13). Ms. Chelland requested that Mr. Gawron execute a document withdrawing two of his bids, "which [he] did for the one [property] in Scranton because [he] really didn't care too much." (*Id.*). Mr. Gawron, however, refused to sign any documentation withdrawing his bid for the Woodmere Avenue property. (*Id.*). He also refused to pick up his money order at the Tax Claim Bureau.[7] (*Id.*).

---

[7] Ms. Chelland testified that after repeated calls to Mr. Gawron to pick up the money order, it was subsequently decided to send him his check by certified mail on February 15, 2011. (*Id.*, at ¶ 39). Ms. Chelland attributed the approximately five month delay in returning Swinka's money order to Mr. Gawron's failure to return her phone calls and come into the Tax Claim Bureau's office to pick up the money order. (Doc. 39-5, at 9).

Mr. Gawron because suspicious about the redemption of the Woodmere Avenue property and requested documentation concerning the redemption from the Tax Claim Bureau. That lead to his discovery of a Tax Claim Receipt for the Woodmere Avenue Property dated October 14, 2010, showing that an individual named Joanne Huddy paid the deliquent taxes on the Woodmere Avenue property on that date (twenty-four (24) days after the conclusion of the September 20, 2010 Upset Tax Sale). (Doc. 23, at ¶ 66); (Doc. 33, at ¶ 66); (Doc. 40-3). The amount paid by Ms. Huddy on October 14, 2010 was $542.51— which is an increase of $1.35 over what Swinka had bid for the property at the Upset Tax Sale.[8] (Doc. 23, at ¶¶ 67-68); (Doc. 38-2, at 6-8).

### iv. Proceedings in State Court

On November 19, 2010, the Tax Claim Bureau filed an Amended Consolidated Return of Upset Tax Sale Properties Held on September 20, 2010, pursuant to the Real Estate Tax Sale Law of 1947, as amended (the "Consolidated Return"). (Doc. 39-6). The Consolidated Return did not include the Woodmere Avenue property, which the Tax Claim Bureau had removed from the sale as redeemed. (Doc. 38-2, at ¶ 40). Later that same day, the Lackawanna County Court of Common Pleas filed an Order of Confirmed *Nisi*. (Doc. 38-2, at ¶ 42); (Doc. 39-7). Swinka was listed as the purchaser of thirteen (13) properties in the

---

[8] The closing for the Woodmere Avenue property took place as scheduled on October 8, 2010 with a sales price of $177,000. (Doc. 38-2, at ¶ 13). At the time of the closing sufficient money was escrowed from the gross sales proceeds by the closing agent in order to pay in full the delinquent taxes on the Woodmere Avenue property. (*Id.* at ¶ 14). Mr. Fennell received a check from the net sales proceeds. (*Id.*).

13

Consolidated Return, but was not listed as the purchaser of the Woodmere Avenue property. (Doc. 38-2. at ¶ 46).

On December 10, 2010, counsel for Swinka sent a letter to the Tax Claim Bureau indicating that Swinka intended to take legal action regarding the Woodmere Avenue property. (Doc. 23, at ¶ 69); (Doc. 33, at ¶ 69). Ten days later, on December 20, 2010, a Decree of Absolute Confirmation was filed by the Court of Common Pleas. At no time between the filing of the Consolidated Return on November 19, 2010, and the Decree of Absolute Confirmation did Swinka file an exception or objection to the Consolidated Return. (Doc. 38-1, at ¶ 47); (Doc. 39-8). Nor did the Tax Claim Bureau file any exceptions or objections to the sale on behalf of Mr. Fennell. (Doc. 33, at ¶ 52). And, to date, Defendant Lackawanna County has neither filed a Declaration of Taking nor a Petition for the Appointment of a Board of Viewers regarding the Woodmere Avenue property. (*Id.*, at ¶ 129). The County has also neither paid nor offered to pay Swinka any compensation for the property in question. (*Id.*, at ¶ 130). Instead, Defendants returned to Swinka its money order of $541.16.

## III.   STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the burden of

showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party

must offer specific facts contradicting those averred by the movant to establish a genuine

issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990).  Therefore,

the non-moving party may not oppose summary judgment simply on the basis of the

pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S. at

248.  "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1)(A)-(B).

In evaluating whether summary judgment should be granted, "[t]he court need consider

only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P.

56(c)(3).  "Inferences should be drawn in the light most favorable to the non-moving party,

and where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d

1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).  Where, as here, the Court is

"confronted with cross-motions for summary judgment, the court must rule on each party's

motion on an individual and separate basis, determining, for each side, whether a judgment

may be entered in accordance with the summary judgment standard." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 187 F. App'x 266, 270 (3d Cir. 2006). "Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (internal citation and quotation marks omitted).

## IV.   ANALYSIS

Both Plaintiff and the Defendants have moved for summary judgment on all counts. Before addressing Swinka's pendent state law claims, the Court will first address Swinka's federal constitutional claims brought pursuant to 42 U.S.C. § 1983.

### A. Procedural Due Process and Equal Protection

The parties both seek summary judgment on Count III, in which Swinka alleges that Defendants', acting under color of state law, violated its rights to procedural due process and equal protection under the Fourteenth Amendment to the United States Constitution. The Court addresses each claim in turn.

### i.   Procedural Due Process

"The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the

meaning of the Due Process Clause." *Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 9, 98 S. Ct. 1554, 56 L.Ed.2d 30 (1978). "At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law."[9] *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (internal citation and quotation marks omitted). "Due Process is flexible and calls for such procedural protection as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 324, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976). The Court will first address the nature of Swinka's claimed property interest.

### a. Deprivation of Property

Defendants maintain that Swinka was not deprived of any property interest encompassed within the Fourteenth Amendment's Due Process Clause. Swinka, in contrast, asserts that it held an equitable interest in the Woodmere Avenue property following the Upset Tax Sale. State law creates property rights which are protected by the

---

[9] In addition, the claimed deprivation must have been committed by a person acting under color of state law. *Kelly v. Borough of Sayreville, New Jersey*, 107 F.3d 1073, 1077 (3d Cir. 1997). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L.Ed.2d 40 (1988) (internal citation and quotation marks omitted). There is no dispute that Defendants qualify as state actors within the meaning of §1983.

Fourteenth Amendment. *See Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577, 92

S. Ct. 2701, 33 L.Ed.2d 548 (1972) ("Property interests, of course, are not created by the

Constitution. Rather they are created and their dimensions are defined by existing rules or

understandings that stem from an independent source such as state law rules."). "Although

the underlying substantive interest is created by 'an independent source such as state law,'

federal constitutional law determines whether that interest rises to the level of a 'legitimate

claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas, & Water

Div.*, 436 U.S. at 9 (quoting *Roth*, 408 U.S. at 577). The Court must therefore look to

Pennsylvania law to determine what property interest—if any—Swinka possessed in the

Woodmere Avenue property by virtue of being the sole bidder at the September 20, 2010,

Upset Tax Sale.

Swinka claims that it held equitable title to the Woodmere Avenue property immediately

upon the conclusion of the Upset Tax Sale. Defendants, however, note that an "actual sale"

does not take place until the successful bidder pays the amount of the bid and where, as

here, an owner redeems the property prior to payment by the bidder then an "actual sale"

does not take place. *See Weber v. Clearfield Cnty. Tax Claim Bureau*, No. 635 C.D. 2015,

2016 WL 100232, at *4 (Pa. Cmwlth. Jan. 7, 2016) ("[A]n actual sale of a subject property

does not occur until the successful bidder pays the full amount of money agreed to be paid

as the sale price under Sections 605-609."). The Pennsylvania Supreme Court has held that

a "*successful bidder*" at the tax sale is an "equitable owner," of the property. *Pivirotto v. City*

18

*of Pittsburgh*, 528 A.2d 125, 128 (Pa. 1987) ("[T]he purchaser at a tax sale does acquire an

ownership interest in the premises, a principle we now affirm and proclaim as law.").

However, the Court's holding was limited to *successful bidders*.  Although Swinka was the

only bidder for the Woodmere Avenue property, its bid was *not successful* due to Mr.

Fennell's redemption of the property later that day.  Swinka does not direct the Court to *any*

case holding that, as the sole bidder at an Upset Tax Sale for a property that was

subsequently redeemed, it nevertheless qualifies as the equitable owner of property at

issue.  Nor could it; as the *Pivirotto* court specifically recognized that the purchaser at a tax

sale is the equitable owner of the property "*barring redemption by the record owner.*" *Id.*

(emphasis added).  Because the Woodmere Avenue property had been redeemed on the

same day as the tax sale, Swinka's asserted property interest in the Woodmere Avenue

property fails.[10]  *See In re Public Sale of Properties*, 841 A.2d 619, 624 (Pa. Cmwlth. 2004)

---

[10] Even if the Court assumes that the redemption was improper under Pennsylvania Real Estate
Tax Sale Law, Swinka's asserted property interest was far too remote and inchoate to be regarded as
property within the meaning of the Fourteenth Amendment. *See Rogers v. Bucks Cnty. Domestic Relations
Section*, 773 F. Supp. 768, 772-73 (E.D. Pa. 1991) ("[M]ost property interests are created under or
generated by state law, [and] federal courts will normally look to state law to determine whether a particular
interest is 'property', or whether it is too remote or inchoate to be so regarded."); *see also Lees v. West
Greene Sch. Dist.*, 632 F. Supp. 1327, 1333 (W.D. Pa. 1985) ("A mere subjective expectancy, however,
does not create a property interest.  Plaintiff must show a legitimate claim of entitlement to state a property
interest protected by the due process requirements of the Fourteenth Amendment."); *McCulloch v. Dist. of
Columbia*, 685 A.2d 399, 401 (D.C. 1996) ("Rather, a tax sale purchaser-private or public-acquires an
inchoate interest in the property . . .").

Moreover, Swinka's attempt to manufacture a genuine issue of fact by pointing to Mr. Koldjeski's
testimony that he could not recall the conversation with Attorney Olivetti (three years after the fact) fails to
do so, as the conversation between them is not material to the dispute.  This is so because, as Swinka
readily admits, Attorney Olivetti faxed documentation to the Tax Claim Bureau at noon on the day of the
Upset Tax Sale and Mr. Koldjeski determined that the documentation was sufficient to redeem the property.
(Doc. 40, at ¶¶ 18, 19).

("A taxpayer who follows the Section 603 procedure, including an installment plan, may remove a property from sale; *however, this does not mean that the taxing authorities cannot agree to another payment plan.*") (emphasis added).

### b. Adequate Procedures

Even if the Court were to assume that Swinka possessed a property interest in the Woodmere Avenue property protectable by the Fourteenth Amendment, it would conclude that the procedures afforded to Swinka were more than adequate under the circumstances. "Property interests may only be deprived subject to constitutionally adequate procedures." *Ransom v. Carbondale Area Sch. Dist.*, 982 F. Supp. 2d 397, 403 (M.D. Pa. 2013). And, "[t]he level of process due to a party prior to the deprivation of a property interest, such as a lien, is highly dependent on the context." *In re Mansaray-Ruffin*, 530 F.3d 230, 239 (3d Cir. 2008). "An elementary and fundamental requirement of due process is any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L.Ed. 865 (1950). "[T]he focus in procedural due process claims is on the adequacy of the remedial procedure, and not on the government's actual actions that allegedly deprived the individual of his liberty or property interest." *Button v. Snelson*, No. 3:12-CV-01941, 2016 WL 1252684, at *11 (M.D. Pa. Mar. 23, 2016) (internal citation and quotation marks omitted).

20

Here, Swinka does not claim that it lacked notice of the filing of the Consolidated Return before the Court of Common Pleas or any subsequent proceedings concerning the September 20, 2010 Upset Tax Sale.[11]  Nor could it; as the record demonstrates that Swinka had 13 other properties included in the Consolidated Return and had thirty (30) days to raise any objections or exceptions to that return prior to the final confirmation of the Upset Tax Sale by the Court of Common Pleas.  Moreover, during the thirty days Swinka had to file any exception and/or objections to the Consolidated Return Swinka, through its counsel, corresponded with Defendants and threatened to bring legal action over what it asserted was an improper redemption of the Woodmere Avenue property.  As Defendants correctly note:

> When the Consolidated Return was submitted to the Court, the property was not listed, since it had been redeemed.  Swinka had a number of other properties that were listed on the Consolidated Return for approval.  However, Swinka did not file an exception or objection to void the redemption, as the bidders did in the *Hamilton Enterprises* and *William Dodge* cases.  If Swinka had done so, the Court would have made a determination as to whether or not the redemption was proper.  If Swinka was dissatisfied with the decision of the Court, it could have appealed to the Commonwealth Court, as did the bidders in the aforementioned cases.  However, even if Swinka had prevailed before the Trial Court or Commonwealth Court, it still would not have been awarded the property.  That would have merely set aside the redemption.  A return to confirm the sale would still have to be submitted to the Court of Common Pleas to which an exception or objection could be filed by the owner.  In this case, Fennell would have done so, or perhaps the then owner of the property

---

[11] The Court finds it unnecessary to the resolution of this matter to determine whether Mr. Fennell, as owner of the Woodmere Avenue property, received the appropriate notice in accordance with Pennsylvania Real Estate Tax Sale Law.  And, as Swinka, notes, "the issue of whether the service was good is not before this Court." (Doc. 40, at 2 n.1).  Even if the Court were to assume that Mr. Fennell received proper notice of the Upset Tax Sale, that would not change the resolution of this matter since it is immaterial to the Court's determination of Plaintiff's claims.  What matters is that Plaintiff had notice of the filing of the Consolidated Return and failed to present its challenge to the State Court.

would have done so.  As the Tax Claim Bureau has readily acknowledged, the sale would have been voided because proper notice had not been given to the owner. Swinka would still not own the property.  A procedure was in place to allow all interested parties an opportunity to have any exceptions they had in regard to the way the sale was conducted under law heard by a Court of competent jurisdiction.

(Doc. 39, at 20-21).

Swinka nevertheless asserts that because it was neither the "owner" nor "lien creditor" at the time of the Upset Tax Sale, it lacked standing to assert any exceptions and/or objections to the Consolidated Return before the State court and therefore had no meaningful opportunity to be heard.  (Doc. 45, at 32).  However, a review of the case law reveals that Courts in Pennsylvania routinely hear objections and/or exceptions filed by bidders at an Upset Tax Sale.[12]  *See, e.g., M.C. & E.K. Lees, Inc. v. W.R. Capenos,* 119 A.3d 1092, 1099 (Pa. Cmwlth. 2015) ("[A] person who wishes to challenge the tax sale may do so . . . by filing exceptions or objections within thirty days after the trial court has made confirmation nisi under the RETSL"); *Moore v. Keller,* 98 A.3d 1 (Pa. Cmwlth. 2014) (holding that the equitable owner of property had standing to challenge tax sale); *Husak v. Fayette Cnty. Tax Claim Bureau,* 61 A.3d 302 (Pa. Cmwlth. 2013) (same); *Dolphin Serv. Corp. v. Montgomery Cnty. Tax Claim Bureau,* 557 A.2d 38, 39 n.2 (Pa. Cmwlth. 1989) ("Where, as here, the

---

[12] It is true, as Swinka notes, that some Courts in Pennsylvania have found that bidders similarly situated to Swinka lacked standing to assert objections or exceptions to a consolidated return. *See First Horizon Home Loan Corp. v. Adams Cnty. Tax Claim Bureau,* 847 A.2d 774, 777 (Pa. Cmwlth. 2004) (holding that the only parties who have standing to challenge a Consolidated Return are the owner or the lien creditor at the time of sale). Nevertheless, there is authority to the contrary, and Swinka knowingly failed to avail itself to *any* procedure available under the Pennsylvania Real Estate Tax Sale Law. Had Swinka filed an objection and/or exception to the Consolidated Return, and been denied the opportunity to participate in the proceedings, this Court may have looked differently on its claimed due process violation.

purchaser is the party seeking to uphold the validity of the tax sale, the purchaser stands in the shoes of the Bureau."); *In re Upset Sale of September 8, 1980 of Montgomery Cnty. Tax Claim Bureau*, 495 A.2d 221, 222 (Pa. Cmwlth. 1985) ("When the Bureau filed its Final Return for the 1980 Upset Tax Sale, these five properties were listed as not sold, having been redeemed. [The bidder] filed exceptions to the Bureau's Final Return and sought to have itself confirmed as the successful bidder and owner of those five properties."); *In re Upset Tax Sale, Tax Claim Bureau of Montgomery Cnty. Pennsylvania, Held September 13, 1971 and September 8, 1980, William Dodge*, 499 A.2d 12 (Pa. Cmwlth. 1985) (purchaser at tax sale permitted to file objections and exceptions to county tax claim bureau's voiding of sale based on taxpayers' verbal assurances that they would make an installment payment and enter into an agreement).[13]

In stark contrast to the cases cited above, Swinka failed to file *any* exceptions and/or objections to the Consolidated Return. It is well settled that "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). "If there is a process on the books that

---

[13] *See also In re Sale by Tax Claim Bureau Bedford Cnty. of Tax Parcel G.14-0.00-007*, 112 A.3d 685, 689 (Pa. Cmwlth. 2015) (describing the facts of *William Dodge* as follows: "[t]here, a property owned by Tracy and Ester Moody (Moodys) was sold to William Dodge (Dodge) at an upset set. Immediately *after* the upset sale, the Moodys offered to make an installment payment of $100.00. The Montgomery County Tax Claim Bureau informed the Moodys that the upset sale would be voided if they promptly paid twenty-five percent of the taxes and entered into an agreement to pay the balance. The Moodys did so three days later. The upset sale purchaser filed exceptions to the tax claim bureau's consolidated return for the upset sale. . .") (emphasis in original).

appears to provide due process, the plaintiff cannot skip that process and use the federal

courts as a means to get back what he wants." *Id.*   As Defendants note, "[i]f any errors

were made by the Tax Claim Bureau, a system was in place to have the actions

challenged."[14]  (Doc. 39, at 22).   Because Swinka failed to avail itself to any state law

procedures challenging the Upset Tax Sale, it cannot assert a deprivation of procedural due

process.[15]  Therefore, the Court will deny Plaintiff's Motion for Summary Judgment with

respect to its procedural due process claim and will grant Defendants' Motion for Summary

Judgment. *See Agarwal v. Schuylkill Cnty. Tax Claim Bureau*, Civil Action No. 3:CV-09-

1921, 2010 WL 5175090, at *8 (M.D. Pa. July 20, 2010) ("Plaintiffs were able to oppose the

---

[14] "Even if any of the defendants have a duty to comply with these . . . provisions, something which I do not decide here, the provisions are not rendered unconstitutional by failure of any defendant to comply with their requirements." *Shipley v. Delaware Cnty. Tax Claim Bureau*, Civil Action No. 13-7398, 2015 WL 2208521, at *9 (E.D. Pa. May 12, 2015).

[15] Plaintiff also did not file any other action, such as an action to quiet title. *See Horton v. Washington Cnty. Tax Claim Bureau*, 623 Pa. 113, 118 (2013) (noting that "[a]fter the tax upset sale, [the purchaser] retained [an attorney] to file a quiet title action"); *see also* P.R.C.P. § 1061(b)(4) (providing that a quiet title action may be brought "to obtain possession of land sold at a judicial or tax sale"). "Although the case law [interpreting § 1061(b)(4)] is scarce, it seems apparent . . . that a plaintiff must either be the purchaser of, or have some type of interest in, property sold at a tax sale and establish his title and *right to* possession." *Pennsylvania v. Thomas E. Proctor Heirs Trust*, Civil Action No. 1:12-CV-1567, 2014 WL 3696288, at *6 (M.D. Pa. July 24, 2014) (emphasis in original).

Nor did Plaintiff file an action in ejectment. *In re Walker*, 2005 WL 6522758, at *7 n.9 ("In general, under Pennsylvania law, ejectment proceedings are 'the classic method of determining title to real estate.'") (quoting *Teacher v. Kijurina*, 365 Pa. 480, 484 (1950)). "An action to quiet title may be brought only where an action in ejectment will not lie." *Moore v. Duran*, 455 Pa. Super. 124, 134 (1996). The Court expresses no opinion on the merit of any of these hypothetical claims. *See McCulloch*, 685 A.2d at 404 ("If the McCullochs believe that some of the properties were redeemed in violation of the McCullochs' rights, for example, they are free to put that view to the test by bringing an action against the original owners for ejectment or to quiet title. We express no opinion on the outcome of such hypothetical proceedings . . .").

tax sale, and this evidence belies Plaintiffs' claim that they were denied access" to the Court).

### ii.    Equal Protection

Next, the Court will address Swinka's equal protection claim also alleged in Count III. The Fourteenth Amendment to the U.S. Constitution provides, in relevant part, that no state shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.  The Supreme Court has recognized that this is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Cent.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L.Ed.2d 313 (1985).

Swinka brings a "class-of-one" equal protection claim, which the Supreme Court recognized in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam).   "According to that theory, a plaintiff states a claim for violation of the Equal Protection clause when he 'alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Hill*, 455 F.3d at 239 (quoting *Olech*, 528 U.S. at 564).  At the very least, "a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Id.*

Here, Swinka's equal protection claim fails and Defendants are entitled to summary judgment because Swinka has set forth no evidence from which a rational factfinder could

25

find it was intentionally treated differently from similarly situated persons.[16] (Doc. 45, at 27-30).  Indeed, there are neither allegations nor evidence concerning any persons similarly situated to Swinka who apparently received more favorable treatment than Defendants.

"Persons are similarly situated under the Equal Protection Clause when they are alike in all

---

[16] Mr. Koldjeski  testified that he had never refused to accept a commitment letter, at least when the commitment letter was signed.  (Doc. 45-3, at 22).  Moreover, Ms. Chelland testified that when a property owner is selling the property, the Tax Bureau "need[s] a commitment letter that the property is going to be sold at a certain time and that someone has put a down payment to buy the property." (Doc. 45-5, at 11). She further testified that when a sale has already occurred and the Tax Bureau receives a commitment letter later that day, they will undo a sale—which has happened on more than one occasion. (*Id.* at 12-13). In addition, Mr. Koldjeski testified regarding his understanding of the redemption process that:

> Well, first thing about redemption is – see, we're in the business to collect taxes not to sell property. That's basically what we're charged to do.  The sale takes place because that's the end result of people just not paying their taxes.  So when we talk about redemption, redemption comes with actual payment of the taxes in full or the making of a payment plan, as I discussed earlier or if it's some type of a mechanism, be it a confirmation letter from a sale that the closing is going to be in a few days and you'll have all your money at that particular time.  Again, keeping with my philosophy of getting taxes paid instead of selling property, we honor those.

(Doc. 39-4, at 11).  He further testified that with redemption "you do have some leeway." (Doc. 45-3, at 28).  With respect to the use of commitment letters, which Mr. Koldjeski testified that the Bureau has accepted in the past he said:

> Normally, the letter comes – I think in this case I got a sales contract and I got a letter from the attorney saying that the money was in place.  I also saw in the sales contract – that there was a down payment. I think it was – don't hold to me to this, but I think it was $2,000 or $5,000.  There was a down payment so I knew there was money in escrow if something happened with the sale.  Being in the real estate business for about thirty years, I know that if you have a commitment and you don't go through with the sale, you're going to lose your down payment.  That's a fact.  By losing the down payment, we have the right to come in as the Tax Claim Bureau and ask for our taxes at that time.  So we're not going to lose on that.  In this particular case, before we did anything, I went and checked the posting notices and the problem we had with this particular property is that these people were not given personal service. Under the law because they occupied the house, you have to have given them personal service.  Our constable did not effectuate person service.  So when I looked at that, I said we're not going to – the bidder is not going to get the property if there's an objection filed and knowing the attorney who sent it through, I was pretty sure that if he knows his way around, he's going to file an objection.  So I took what I felt was the prudent way out and that was to accept the commitment letter, let them pay the taxes and go on.

(Doc. 39-4, at 12-13).

relevant aspects." *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008)

(internal citation and quotation marks omitted). Notably, Swinka fails to identify any persons

who bid on property at the September 20, 2010 tax sale (or any other tax sale conducted by

the Defendants); let alone the supposed differential treatment they received. At bottom,

Swinka has not and cannot demonstrate how it was treated differently than if the bidder

under those circumstances had been someone else.[17]  *See Renchenski v. Williams*, 622

F.3d 315, 338 (3d Cir. 2010) ("His claim fails because he has adduced no evidence of

unequal treatment, and in order to forestall summary judgment, [Plaintiff] must bring forth

enough evidence from which a reasonable jury could find in his favor. Here, he makes

mere conclusory allegations. And these allegations, even if accepted as true, fall short.").

---

[17] In addition, "[i]f there was a rational basis for the action of the decisionmaker, there is no equal
protection class of one violation." *Brace v. Cnty. of Luzerne*, 873 F. Supp. 2d 616, 630 (M.D. Pa. 2012),
*aff'd* 535 F. App'x 155 (3d Cir. 2013). This "imposes a high burden, requiring differential treatment that is
irrational and wholly arbitrary." *Hwy. Mats. Inc. v. Whitemarsh Twp.*, 386 F. App'x 251, 259 (3d Cir. 2010)
(internal citation and quotation marks omitted). "Furthermore, an action that affects neither a fundamental
right nor a suspect classification is accorded a strong presumption of validity." *Montanye v. Wissahickon
Sch. Dist.*, 399 F. Supp. 2d 615, 622 (E.D. Pa. Nov. 3, 2005).

Where, as here, "there is any reasonably conceivable state of facts that could provide a rational basis"
for Defendants' conduct, the claim fails. *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L.Ed.2d
257 (1993). Defendants' conduct is plainly rationally related to a legitimate government purpose—namely,
the recovery of delinquent taxes without depriving the property owner of his property rights. And there is no
doubt that Courts in Pennsylvania routinely recognize that "[t]he primary purpose of the Real Estate Tax
Sale Law is to ensure the collection of taxes, not to deprive citizens of their property rights." *Cruder v.
Westmoreland Cnty. Tax Claim Bureau*, 861 A.2d 411, 415 (Pa. Cmwlth. 2004) (citing *Stanford-Gale v. Tax
Claim Bureau of Susquehanna Cnty.*, 816 A.2d 1214, 1216 (Pa. Cmwlth. 2003). Thus, even if one were to
assume that Swinka was treated differently than similarly situated persons, Defendants' conduct was
rationally related to a legitimate government purpose.

Accordingly, Defendants' Motion for Summary Judgment as to Count III will be granted in its entirety and Plaintiff's Motion for Summary Judgment as to Count III will be denied.[18]

## B. Fifth Amendment Just Compensation Claim

In Count IV, Swinka asserts that Defendants' conduct resulted in a taking of its property without just compensation in violation of the Fifth Amendment to the United States Constitution. "The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, proscribes the taking of private property for public use without just compensation." *Cnty. Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006). The Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The purpose of the Fifth Amendment is "not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of an otherwise proper interference amounting to a taking." *Id.* at 315 (emphasis in original).

The Court finds that Swinka's Takings claim fails as a matter of law for at least two reasons. *First*, Swinka's Taking claim is not ripe for adjudication. In *Williamson Cnty. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 194-95, 105 S. Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court held that an as-applied Takings claim is not ripe until: (1) the government actor has reached a final decision regarding "the property at

---

[18] Because the Court is granting Defendants' Motion for Summary Judgment, it need not address Defendants' argument that the Tax Claim Bureau cannot be sued concurrently with the County under Section 1983 because the Tax Claim Bureau is an "administrative arm" of the County. (Doc. 39).

issue," and (2) the plaintiff has unsuccessfully exhausted the state's procedures for

obtaining "just compensation," as long as those state procedures were adequate. *Id.* "The

second prong of the *Williamson* ripeness test states that 'if a State provides an adequate

procedure for seeking just compensation,' the plaintiff must have exhausted this procedure

in order for his or her Takings claim to be ripe for federal adjudication." *Cnty. Concrete*

*Corp.*, 442 F.3d at 167-68 (quoting *Williamson Cnty.*, 472 U.S. at 194-95)). "Because the

Fifth Amendment bars not just the 'taking' of property, but the taking of property 'without just

compensation,' a plaintiff cannot claim a violation of the Just Compensation Clause until he

or she has exhausted a state's 'procedure for seeking just compensation." *Id.* at 168

(internal citation and quotation marks omitted).  Because Swinka has not availed itself of the

procedures for obtaining just compensation under Pennsylvania law, its Takings claim is not

ripe for adjudication before this Court.[19]  *See Ash v. Redevelopment Auth. of Philadelphia*,

143 F. App'x 439, 441 (3d Cir. 2005) ("Because [plaintiff] has not utilized state remedies, he

---

[19] "Pennsylvania's Eminent Domain Code provides that a condemnee is entitled to just compensation for the taking, injury or destruction of his property." *Ash v. Redevelopment Auth. of Philadelphia*, 143 F. App'x 439, 441 (3d Cir. 2005) (citing 26 Pa. Const. Stat. Ann. § 1-601). "In addition, it provides a procedure in state court by which a property owner may pursue relief for the taking of his property. *Id.* (citing 26 Pa. Const. Stat. Ann. § 1-502). "The Code also states that '[i]t is intended by this act to provide a complete and exclusive procedure and law to govern all condemnations of property for public purposes and the assessment of damages therefor . . .'" *Id.* (quoting 26 Pa. Const. Stat. Ann. § 1-303).

"Pennsylvania's federal courts have repeatedly held that the Eminent Domain Code of Pennsylvania, 26 Pa. C.S.A. § 101 *et seq.*, provides an adequate process for seeking just compensation." *Bolick v. Northeast Indus. Servs. Corp.*, No. 4:14-CV-0409, 2015 WL 540066, at *5 (M.D. Pa. Feb. 10, 2015) (citations omitted); *see also Chainey v. Street*, 523 F.3d 200, (3d Cir. 2008) ("Pennsylvania provides adequate process for plaintiffs to obtain just compensation. Pennsylvania's Eminent Domain code provides inverse condemnation procedures through which a landowner may seek just compensation for the taking of property.").

has not been denied just compensation.  Thus, he cannot at this time show a violation of the Just Compensation Clause and his taking claim is not ripe for review."); *see also Cowell v. Palmer Twp.*, 263 F.3d 286, 290 (3d Cir. 2001) ("Because the plaintiffs have not availed themselves of the appropriate procedures under Pennsylvania law to obtain just compensation, we agree with the District Court that their takings claim is not ripe.").

*Second*, even assuming that Swinka's Takings claim is ripe for adjudication, the Court finds that it wholly lacks merits under the relevant case law.[20]  *See Dommel Props., LLC v. Jonestown Bank & Trust Co.*, Civil Action No. 1:11-cv-2316, 2013 WL 1149265, at *11 (M.D. Pa. Mar. 19, 2013) ("A tax sale, however, is not a taking for public purpose pursuant to a state's power of eminent domain, but is instead an exercise of the state's taxing power."). Indeed, Courts routinely reject Takings claims arising out of a government tax sales, because the alleged conduct fails the "public use" requirement set forth in the Fifth Amendment's Takings Clause.  *See, e.g., id.* at *12 ("Even if the Tax Sale was fraudulently conducted, it would not constitute a taking because it benefitted a private entity . . . and is therefore not a taking 'for public use.'"); *Speed v. Mills*, 919 F. Supp. 2d 122, 129 (D.D.C. 2013) ("'A tax sale is not a government taking for which just compensation must be paid under the Constitution. . .'") (quoting *Bank of Washington v. Sheve*, 307 F. Supp. 98, 99 (D.D.C. 1969)); *In re Murphy*, 331 B.R. 107 (Bankr. S.D.N.Y. 2005) (holding that a tax sale

---

[20] The Court previously found that "[c]learly, under the statute, Plaintiff is neither a condemnee nor a displaced person, Defendants are not condemnors, and there was no condemnation of properly for public purposes in this case."  *Swinka Realty Investments, LLC v. Lackawanna Cnty. Tax Claim Bureau*, No. 3:13-CV-764, 2013 WL 5656615, at *7 (M.D. Pa. Oct. 15, 2013).

does not qualify as a taking).  Therefore, "[a] tax sale is not a government taking pursuant to the state's power of eminent domain; rather, it is an exercise of the state's taxing power, intended to enforce tax laws and ensure the collection of revenue." *Dommel Props. LLC*, 2013 WL 1149265, at * 18.  Thus, Defendants' Motion for Summary Judgment with respect to Count IV will be granted and Plaintiff's Motion for Summary Judgment will be denied.

### C.  Breach of Contract

The Court will next address Swinka's claim for breach of contract.  Under Pennsylvania law, there are three requirements to bring a breach of contract action:  (1) the existence of a contract; (2) breach of a duty imposed by the contract; and (3) damages resulting from the breach.  *Sullivan v. Chartwell Inv. Partners, L.P.*, 2005 Pa. Super. 124, 873 A.2d 710 (2005) (citing *J.F. Walker Co. Inc. v. Excalibur Oil Grp.*, 792 A.2d 1269 (Pa. Super. 2002)). Moreover, it is well-settled that "[a]bsent a manifestation of an intent to be bound . . . negotiations concerning the terms of a possible future contract do not result in an enforceable agreement." *Philmar Mid-Atlantic, Inc. v. York Street Assoc. II*, 389 Pa. Super. 297, 300 (1989).

A review of the record and relevant case law demonstrates that Swinka's breach of contract claim fails as a matter of law and therefore Swinka's Motion for Summary Judgment will be denied and Defendants' Motion for Summary will be granted with respect to Count I.  *First*, because Defendants determined that the Woodmere Avenue property had been redeemed (and provided bidders with notice of the possibility that a property for sale at

31

the could be redeemed by the owner later that day), the "transaction[] did not result in [a] completed sale by the Bureau," *In re Upset Sale of September 8, 1980 of Montgomery Cnty. Tax Claim Bureau*, 495 A.2d 221, 221 (Pa. Cmwlth. 1985), and thus there was no contract entered into between Swinka and Defendants.  This conclusion is buttressed by the Tax Claim Bureau's policy, which permitted the delinquent taxpayer to "redeem their properties up to the close of business on the day of the upset tax sale even after the auction had been held." *Id.* at 222.  Although there is case law support for the proposition that a right of redemption is extinguished at the fall of the auctioneer's hammer, *see In re Lawrence Cnty. Tax Claim Bureau for Sale of Properties Held in Year 1977 for Delinquent Taxes*,  431 A.2d 1116, 1117 (Pa. Cmwlth. 1981), here, "the Bureau expressly notified all parties and participants . . . that although the actual sale would take place in the morning . . . the sales would not be deemed final until the close of business on that day." *In re Montgomery Cnty.*, 495 A.2d at 222.  "Thus, the Bureau here, by the terms of the sale which were not protested prior to the auction, provided that no sale actually took place in final and binding form until the end of the day.  Thus, we have here a situation where under the terms of the tax sale it was specifically provided that the auction would not be the sale, but would be a sale only if subsequent redemption during the day were not effected."[21]  *Id.* at 222-23.

---

[21] To the extent that Swinka's breach of contract claim results from Defendants' failure to provide notice that a property owner can redeem a property through the commitment letter procedure utilized by Attorney Olvietti and Mr. Koldjeski, the Court finds this distinction wholly immaterial to Swinka's breach of contract claim because the commitment procedure is a permissible means to effect the redemption, and where the redemption is effected there can be no contract.

*Second*, Swinka's breach of contract claim fails because the plain language of the Pennsylvania Real Estate Tax Sale Law precludes such a claim where no exceptions or objections are filed, and the sale is subsequently confirmed.  Specifically, 72 P.S. § 5860.607(g) provides, in relevant part:

> If no objections or exceptions are filed or if objections or exceptions are finally overruled and the sale confirmed absolutely, the validity of the tax, its return for nonpayment, the entry of the claim, or the making of such claim absolute and the proceedings of the bureau with respect to such sale, *shall not thereafter be inquired into judicially in equity or by civil proceedings* by the person in whose name such property was sold, by a grantee or assignee, by any lien creditor *or by any other person*, except with respect to the giving of notice under the act, to the time of holding the sale, or to the time of petitioning the court for an order of sale.

*Id.* (emphasis added).  Here, "no objections or exceptions" were filed by Swinka, and the September 20, 2010, tax sale was confirmed absolutely on December 20, 2010. Accordingly, Pennsylvania law precludes Swinka from maintaining a breach of contract action based on the September 20, 2010 tax sale.  *See, e.g., Mangan v. Brierre*, Civil Action No. 06-3204, 2007 WL 475820, at *7 (E.D. Pa. Feb. 9, 2007) ("After a tax sale is confirmed, it may be overturned only for lack of notice" provided to the owner) (citing 72 P.S. § 5860.607(g)); *Poffenberger v. Goldstein*, 776 A.2d 1037, 1041 n.3 (Pa. Cmwlth. 2001) ("We note that Section 607(g) of the Tax Sale law . . . establishes the conclusiveness of tax sales confirmed absolutely."); *Roeting v. Lancaster Cnty.*, 401 A.2d 580, 581 (Pa. Cmwlth. 1979) (recognizing that "the legislature clearly did not intend the validity of tax sales to be open to challenge on a vague allegation of illegal bidding").

*Third*, Swinka's breach of contract claim also fails because (contrary to its assertions) the right to accept an offer lies with the Tax Claim Bureau, not with Swinka.  *See Seemiller v. Amato*, No. 05-2874, 2007 WL 2687656, at * 2 (Pa. Com. Pl. Mar. 15, 2007) (noting that "once a property has been exposed to an upset sale, provided the notice provisions of the RETSL have been met, legal title to the property passes to the Tax Claim Bureau, as trustee, by operation of law, *regardless of whether an offer to purchase has been made or accepted*) (emphasis added); *accord Rivera v. Carbon Cnty. Tax Claim Bureau*, 857 A.2d 208 (Pa. Cmwlth. 2004).  Moreover, as Defendants' maintain, there was no contract for sale for the Woodmere Avenue property because Defendants plainly did not evidence an intent to enter into a contract with Plaintiff.

*Finally*, Swinka's breach of contract claim fails because any remedy arising out of the Upset Tax Sale was statutory and not based on the common law of contracts.  In similar situations, Courts have found that all the plaintiff is entitled to would be a return of the amount of the bid—here, approximately $541.16 plus interest.  *See, e.g., In re Upset Sale of Properties (Skibo)*, 522 Pa. 230, 560 A.2d 1388 1389 (1989) (holding that purchasers at tax sale later declared void, even if due to defendants' negligence, were barred from recovering any damages from Tax Claim Unit over and above sums they had paid and interest thereon); *Van Petten v. Cnty. of San Diego*, 38 Cal.App.4th 43, 51 (1995) (recognizing "the well-settled rule . . . that purchasers of property at a tax sale are limited to statutory remedies" and rejecting the purchaser's breach of contract claim); *McCulloch*, 685 A.2d at

34

402 ("Rights and liabilities under tax sale proceedings rest entirely upon the statutes involved."). Because Swinka may not maintain a breach of contract action against Defendants based on the September 20, 2010, Upset Tax Sale, the Court will grant Defendants' Motion for Summary Judgment with respect to Count I.[22]

### D.  Mandamus Action Compelling Defendants to Provide a Deed

Finally, the parties seek summary judgment on Count II in which Swinka seeks mandamus relief on the theory that the Tax Claim Bureau "had an obligation to complete the transaction resulting from Swinka's successful bid. In that regard, the Defendants have a ministerial duty to act and ultimately transfer the deed to the Property to Swinka pursuant to the statutes and laws set forth herein." (Doc. 45, at 25). Defendants' failure to do so, according to Swinka, entitles it to mandamus relief. (*Id.*). Defendants maintain, simply, that "mandamus relief is not available in this case." (Doc. 39-1).

"Mandamus is an extraordinary writ which will issue to compel performance of a ministerial act or mandatory duty where there exists a clear legal right in the plaintiff, a corresponding duty in the defendant, and want of any other adequate or appropriate remedy. If any of the foregoing elements is absent, mandamus does not lie." *Larsen v. State Emps. Retirement Sys.*, 553 F. Supp. 2d 403, 426 (M.D. Pa. 2008) (quoting *Burger v. Bd. of Sch. Directors of McGuffey Sch. Dist.*, 805 A.2d 663, 666 (Pa. Commw. Ct. 2002)). "A remedy of mandamus is a drastic measure 'to be invoked only in extraordinary

---

[22] The Court notes that Defendants informed Swinka that it could pick up its money order of $541.16 on September 21, 2010 (the day after the tax sale). However, Mr. Gawron chose not to pick up the money order, requiring Defendants' to return the money order by certified mail in February 2011.

situations.'" *Erving v. Ebbert*, No. 3:12-CV-2481, 2013 WL 393371, at *3 (M.D. Pa. Jan. 31,

2013) (quoting *Stehney v. Perry*, 101 F.3d 925, 935 (3d Cir. 1996)).  As the Third Circuit has

recognized, mandamus relief is "issued rarely."  *Boltz-Rubinstein v. Hagens Berman, Sobol,*

*Shapiro, LLP*, Nos. 11-1633, 11-3170, 2011 WL 5227994, at *1 (3d Cir. Nov. 3, 2011).

 "[T]he party seeking mandamus has the burden of showing that its right to the issuance

of the writ is clear and indisputable."  *Adegbuji v. Mukasey*, No. 3:08-cv-1714, 2008 WL

4541952, at * 3 (M.D. Pa. Oct. 9, 2008) (internal citation and quotation marks omitted);

*accord Tonfack v. Holder*, Civil Action No. 3:13-2996, 2014 WL 4437628, at * 4(M.D. Pa.

Sept. 9, 2014).  "To ensure that the writ will issue only in appropriately extraordinary

circumstances, a party seeking issuance of such a writ must demonstrate (1) that a public

official has a well-defined and mandatory duty to perform a certain act, (2) that the petitioner

has a clear and indisputable right to have that act performed, and (3) that no other adequate

remedy is available."  *Stark v. Holder*, Civil No. 1-CV-11-00003, 2011 WL 5593129 at *7

(M.D. Pa. Nov. 17, 2011) (citing *Mallard v. United States Dist. Court for the Southern Dist. of*

*Iowa*, 490 U.S. 296, 309, 109 S. Ct. 1814, 104 L.Ed.2d 318 (1989)).  "The duty owed by the

government must be a legal duty which is a specific, plain ministerial act devoid of the

exercise of judgment or discretion.  An act is ministerial only when its performance is

positively commanded and so plainly prescribed as to be free from doubt."  *Id.* at *7 (internal

citation and quotation marks omitted).  "Even when this burden is met, the court has

discretion to deny the writ, 'even when technical grounds for mandamus are satisfied.'" *Id.*

(quoting *Coombs v. Staff Attorneys*, 168 F. Supp. 2d 432, 434-35 (E.D. Pa. 2001)).

In the instant matter, Swinka is not entitled to a writ of mandamus directing Defendants

to provide him with a deed for the Woodmere Avenue property for at least four reasons.

*First*, Defendants' claimed duty to provide Swinka with a deed is not simply ministerial in

nature. "An act is ministerial only when its performance is positively commanded and so

plainly prescribed as to be free from doubt." *Tonfack v. Holder*, Civil Action No. 3:13-2996,

2014 WL 4437628, at *4 (M.D. Pa. Sept. 9, 2014) (internal citation and quotation marks

omitted). That is not the case here. *See Sanders v. Westmoreland Cnty. Tax Claim

Bureau*, 92 A.3d 97, 100-01 (Pa. Cmwlth. 2014) ("Even if, as [Plaintiff] argues, [the owner]

did not have the right to redeem her Property, the Bureau could, in its discretion, still permit

her to do so. It is well-established that the decision to accept any compromise of delinquent

taxes . . . is wholly within the discretion of the taxing authorities."). *See also In re Sale of

Vacant Land (186.57 Acres) on Power House Road, Bell Township, Clearfield Cnty.*, No.

486 C.D. 2014, 2014 WL 10298690, at *4 (Pa. Cmwlth. 2014) ("Although Sections 602(e)

and Section 607a do not address the transfer of property within 30 days of a tax sale,

Section 208 of the Tax Sale Law provides the Bureau with broad authority for the

management and disposition of property in accordance with the provisions of this act.")

(internal citation and quotation marks omitted). Moreover, "[p]ayment by the successful

bidder to the taxing authority does not, however, result in the immediate receipt of a deed

from the taxing authority to the bidder." *In re Walker*, 2005 WL 6522758, at *3. Rather, the tax sale must be confirmed by the Court or Common Pleas prior to any deed transfer.

*Second*, Plaintiff does not and cannot argue that it has no adequate remedy at law. Swinka had an adequate remedy at law—filing an exception or objection to the Consolidated Return. However, it chose not to avail itself to the remedies set forth in the Pennsylvania Real Estate Tax Sale Law. Moreover, Plaintiff fails to cite to a single case in support of its position that, under the circumstances, it is entitled to mandamus relief as a matter of law. (Doc. 45, at 25).

*Third*, and "more fundamentally," "to the extent that [Plaintiff] seeks an order directing state courts or state officials to take action, the request lies outside the bounds of our mandamus jurisdiction as a federal court." *In re Brown*, 382 F. App'x 150, 151 (3d Cir. 2010) (citing *In re Tennant*, 359 F.3d 523, 531 (D.C. Cir. 2004)). Plaintiff "must turn to state courts if he seeks a writ of mandamus against state officials based upon the alleged misapplication of state law." *Coles v. Commonwealth of Pennsylvania Bd. of Probation & Parole*, Civil No. 1:10-CV-1976, at *6 (M.D. Pa. Oct. 26, 2010).

*Finally*, the Court finds that the equities strongly tip in favor of Defendants. *See Kohn*, 817 F. Supp. 2d at 511 (noting that "mandamus is equitable in nature"). Swinka seeks to obtain a property worth over $177,000 (for which it purported to pay a mere $541.16 over six years ago) from what appears to be an innocent third party. The highly speculative nature of Swinka's investment, when weighed against the potential harm to third parties,

convinces the Court that the equities do not favor Swinka. "To the contrary, the risk undertaken by plaintiff in purchasing an interest in property at a . . . tax sale, which by its very nature is a highly speculative enterprise, should not be retroactively reallocated in the name of equity, especially when the subsequent injury was indisputably brought about by plaintiff's own irresponsible conduct." *Martin v. United States*, 37 Fed. Cl. 86, 94 (1996). Moreover, it is important to remember that Pennsylvania Courts routinely recognize "[t]he purpose of the Real Estate Tax Sale Law is to ensure the collection of taxes, not to deprive citizens of their property or to create investment opportunities for those who attend tax sales." *In re Consolidated Return of Tax Claim Bureau of Cnty. of Beaver From August 16, 2011 Upset Sale For Delinquent Taxes*, 105 A.3d 76, 81 (Pa. Cmwlth. 2014). Accordingly, there being no genuine dispute of material fact, Plaintiff's Motion for Summary Judgment on Count II will be denied and Defendants' motion for Summary Judgment will be granted.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted in its entirety and Plaintiff's Motion for Summary Judgment will be denied in its entirety. A separate order follows.

Robert D. Mariani
United States District Judge